UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO. 11-0069** |
| **VERSUS** | * | **JUDGE ROBERT G. JAMES** |
| **DEWAYNE A. MAJOR** | * | **MAG. JUDGE KAREN L. HAYES** |

REPORT AND RECOMMENDATION

Before the undersigned Magistrate Judge, on reference from the District Court, are a motion to suppress [doc. # 32] and motion for disclosure of the government's confidential informant [doc. # 33] filed by defendant, DeWayne A. Major. For reasons stated below, it is recommended that the motions be **DENIED.**

On November 6, 2009, pursuant to an anonymous tip, police officers searched Major's home for narcotics. During the search, the officers found various drugs, cell phones, disposable cameras, a police scanner, and two handguns. The officers arrested the defendant on various state court charges.

On March 24, 2011, a federal grand jury issued an indictment charging Major with being a felon in possession of a firearm in violation of Title 18, United States Code, Section 924(d)(1). Doc. # 1. Having entered a plea of not guilty to the charges against him, Major has filed the instant motion to suppress evidence obtained as a result of the search of his mother's home. Doc. # 32. Major has also filed a motion to compel disclosure of the identity of the confidential informant whose tip led to the aforementioned search. Doc. # 33. Following a delay for briefing and evidentiary hearings held on January 31, 2012, and February 6, 2012, the matter is now before the court.

**I.     BACKGROUND**

The following facts were established via the testimony and evidence presented at the January 31, 2012, and February 6, 2012, hearings held in this matter. Testimony was provided by Monroe Police Department Officers Triche Passman and Tommy Jones, Detective Craig Honeycutt, Naomi Major, and DeWayne Major.

On November 6, 2009, Officer Passman[1] received a call from Detective Craig Honeycutt, who is the head of the Ouachita Crime Stoppers program.[2] Detective Honeycutt told Passman he received a tip from a reliable source that DeWayne Major was in possession of around six ounces of crack cocaine at his house at 301 N. 23rd Street in Monroe.[3] That day Passman and other Monroe Police Officers, including Officer Jones, went to this house to investigate the tip. They did not have an arrest warrant or search warrant at this time. Upon knocking on the door, the defendant's mother, Naomi, opened the door. Naomi was informed of the report that there were drugs in the house, and Passman asked to see her son.

The parties provide contrasting descriptions of the events that followed. The defense contends that the officers barged into the house without permission. On the other hand, the government contends, and the undersigned finds, that Naomi allowed the officers to enter the house. The defense also claims that the Majors asked the officers to exit the house; however, Officer Passman denied this, and Officer Jones testified he never heard anyone ask them to leave

---

[1] Sergeant Triche Passman has been employed as a police officer with the Monroe Police Department for almost twenty years. At the time of the search in this case, Sergeant Passman was working as an agent with Metro Narcotics.

[2] The Crime Stoppers program allows citizens to provide anonymous information on felony crimes in exchange for cash. *See* Crime Stoppers of Ouachita (Feb. 8, 2012), http://www.crimestoppersouachita.com.

[3] Officer Passman testified that Det. Honeycutt told him that the source was reliable, since he or she had previously given information that led to arrests. While the source was anonymous, he or she had been given a Crime Stoppers i.d. number.

the house. DeWayne Major also testified that when he came to the front door to speak with the officers, he asked that the conversation take place outside. According to DeWayne, the officers initially agreed, but as he attempted to step across the threshold the officers pushed him back inside the house. Naomi, however, testified that DeWayne never went to the door because he was "half drunk" from the night before and did not know what was happening. She also stated that he could not go to the door if he tried, because the house was filled with police officers.

Passman testified that he informed DeWayne of the report that there were drugs in the house. DeWayne denied this in his testimony, and claimed that he only learned about the Crime Stoppers tip when he read the police report after his arrest. At some point during their conversation, Officer Passman saw a bag on a shelf with what appeared to contain crack cocaine. Passman claims that DeWayne immediately began stating that the drugs were not his, while DeWayne argues that he did so after the drugs were retrieved. The bag contained twelve rocks of crack cocaine. DeWayne was placed under arrest, and he and Naomi were advised of their rights.

Naomi was questioned about her selling Oxycontin pills that she had obtained using prescriptions. She then took Officer Passman into her bedroom and showed him four prescription bottles filled the day before on November 5, 2009.[4] The government claims that most of the pills were missing from the bottles. Naomi Major admitted at the hearing that between the prior evening when she filled the prescriptions and the morning in question, she had taken approximately eight to ten Hydrocodone, five Soma, six Oxycontin, and one Xanax.

The government contends that when asked if there was any additional crack cocaine, Naomi told DeWayne, "baby, go on back there and show 'em that stuff you got back there."

---

[4] Naomi testified that she did not lead Passman to the back room; rather, she claimed that she was retrieving the medicine herself and when she turned around the officers were right behind her.

Naomi denied saying this. Naomi showed Officer Passman to the back bedroom, where Passman observed a gun magazine containing .45 caliber ammunition. Naomi then directed Passman to a wicker basket inside the night stand; various items were found in the basket, including controlled dangerous substance pills in plastic bags, crack cocaine, and marijuana. After Passman found these items he asked to search the house. Naomi told him that they needed to get a search warrant.

An application for a search warrant and proposed search warrant were prepared and submitted to a state district judge; the judge found probable cause and signed the warrant. After obtaining the state search warrant, the officers discovered a Rohm .22 caliber revolver in the kitchen cabinet. Also in the cabinet was a box of .45 caliber Winchester ammunition, digital scales, and plastic baggies. The officers also found about a gram of crack cocaine, a razor, and a plate of suspected crack cocaine residue elsewhere in the kitchen. Between the bed and the wall in the northwest bedroom, a .45 caliber Colt Commander handgun was found. This is the same room where the .45 caliber magazine was recovered by Officer Passman. This room had mail addressed to DeWayne and Naomi Major on the night stand.

The defendant stated that the drugs and the guns located in the house were not his and he had never seen them. Officer Passman testified that Naomi said all the guns belonged to her, but that DeWayne knew the guns were in the house and had handled both guns. Naomi denied saying this at the hearing.

The officers found three cell phones, including a BlackBerry located beside the bed in the northwest bedroom. The screen saver of this phone consisted of a picture of the defendant holding a semi-automatic handgun with a caption at the bottom reading: "Lay It Down." The gun in the picture appears to be a Colt .45 and appears identical to the Colt .45 seized. Officer Passman recognized the person shown holding the Colt .45 in the screen saver image as the

defendant. The defendant has extensive and distinctive tattoos on his body that correspond with the image shown on the screen saver.

The defendant and his mother were placed under arrest for various state court offenses. Thereafter a federal indictment was returned against the defendant for being a felon in possession of a firearm.

## II.     LAW AND ANALYSIS

### A.     Motion to Suppress

The defendant contends that the officers violated his Fourth Amendment rights when they searched his residence without a search warrant, without consent, and without exigent circumstances. He argues that evidence seized and statements made during this unconstitutional search must be suppressed. The undersigned has evaluated these arguments while considering the axiom that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment – subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967); *accord United States v. Munoz-Guerra*, 788 F.2d 295, 297 (5th Cir. 1986).[5]

### 1.     The Officers Did Not Violate the Defendant's Fourth Amendment Rights By Conducting the "Knock and Talk"

---

[5] As a preliminary matter, the undersigned observes that the defendant possesses the requisite standing to assert a Fourth Amendment violation. Normally, a person cannot claim the protection of the Fourth Amendment unless he "has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). But Fourth Amendment standing does not require an ownership interest in the invaded area; in *Minnesota v. Olson*, for example, the Supreme Court recognized that an overnight guest in a home has a legitimate expectation of privacy in that home. *See Olson*, 495 U.S. 91, 96-97 (1990) (a defendant's "status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable"). Here, although it is not entirely clear, it appears the defendant was sleeping at his grandmother's home only for a few nights, perhaps due to a disagreement with his wife. Thus, as an overnight guest, he had a legitimate expectation of privacy and can challenge the entry and search of the home under the Fourth Amendment.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. "[W]hen an officer of the law simply walks up to the door and knocks, (s)he visits the house in the same lawful way that a private citizen would, and the ensuing 'knock and talk' does not implicate the Fourth Amendment or its exceptions because no search or seizure occurs." *United States v. Walters*, 529 F. Supp. 2d 628, 637-38 (E.D. Tex. 2007) (citing several sources). The Fourth Amendment is not implicated, in part, due to the fact that the technique "has, as its central premise, the presence of a voluntarily cooperating witness." *United States v. Gould*, 364 F.3d 578, 597 (5th Cir. 2004) (Smith, J., dissenting). "Federal courts have recognized the 'knock and talk' strategy as a reasonable investigative tool when officers seek to gain an occupant's consent to search or when officers reasonably suspect criminal activity." *United States v. Jones*, 239 F.3d 716, 720 (5th Cir. 2001).

Here, the officers approached the house in response to an anonymous tip through the Crime Stoppers program. The tip indicated that the defendant was dealing crack cocaine from the residence on N. 23rd Street. Officer Passman was told by Det. Honeycutt that the information was reliable. Based on these facts, the officers reasonably suspected that the defendant was selling crack cocaine from the home, and there is no indication that the "knock and talk" itself implicated the defendant's Fourth Amendment rights.

    2.  **The Officers Received Consent to Enter the House**

"Warrantless searches and seizures inside a home are presumptively unreasonable . . . ." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 158 (2010) (citations and internal quotation marks omitted). Nonetheless, "[o]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Id*. (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

6

(1973)).  To meet this exception, the government must establish (1) effective consent, (2) that was given voluntarily, (3) by a party with actual or apparent authority.  *Id*.

In this case, the government has met its burden.  Officers Passman and Jones testified that they received consent from Naomi Major to enter the residence.  Although this testimony was contradicted by the testimony of the defense witnesses—the defendant and his mother—the undersigned finds the officers' testimony to be more credible.  As for the voluntariness of this consent, Passman testified that the officers originally numbered around seven or eight.  They were dressed in plain clothes, but carried a badge, an exposed weapon, and a ballistics vest bearing their agency's insignia.  Nevertheless, there is no evidence that Naomi felt coerced in any way, or that she did not understand her right to refuse consent.  Finally, as for her authority to consent, Naomi Major testified that she had lived at the house off and on for forty years, she helped with the bills, and she had the right to allow someone in the house.  Thus, it is clear that she had actual authority over the premises, and that she gave voluntary and effective consent to enter the house.  As a result, the undersigned finds that the officers did not violate the defendant's Fourth Amendment rights by entering.

> 3.  **The Seizure of the Bag of Cocaine was Lawful Pursuant to the Plain View Exception**

Because the officers were lawfully present inside the house, the seizure of the bag of cocaine, which was in plain sight, did not violate the Fourth Amendment.  The "plain view" exception to the general rule prohibiting warrantless seizures allows police to seize items where (1) the police lawfully entered the area where the item was located, (2) the item was in plain view, (3) the incriminating nature of the item was "immediately apparent," and (4) the police had a lawful right of access to the item.

In the present case, the undersigned has already determined that the officers had lawfully

entered the house. Officer Passman testified that after Naomi allowed the officers inside the house, he saw the defendant coming out of the bathroom. He told the defendant he needed to speak with him, and the two met in the living room. Thus, Passman both lawfully entered the area where the item was seized and had a lawful right of access to the item. While in the living room, Passman noticed a plastic bag lying on top of an entertainment center in plain view. Passman testified that, considering the color and manner of packaging, he immediately recognized the bag as containing crack cocaine. Accordingly, the plain view exception was satisfied, and the warrantless seizure of the bag of cocaine in the living room did not violate the Fourth Amendment.

### 4. Defendant's Mother Had Authority to Consent to Search of Back Bedroom

The next question is whether the officers obtained consent to enter and search the northwest bedroom. Officer Passman testified that Naomi Major told DeWayne, "Baby, go on back there and show them that stuff you got back there." Passman then asked Naomi to show him to the back of the house, and she led him to the northwest bedroom. Naomi denied all this in her testimony; however, the undersigned finds this testimony to be not credible.[6] When they reached the bedroom, Naomi directed Passman to open the night stand and look for a wicker basket. It was there that Passman found several bags of powder cocaine, crack cocaine, and various pills.

The only issue here is whether Naomi had the actual or apparent authority to consent to a search of the northwest bedroom. Again, valid consent to search can come from "a third party

---

[6] The undersigned observes that the large amount of prescription medications Ms. Major had admittedly ingested since the evening before the incident detracts from the reliability of her testimony.

who possesse[s] common authority over the premises." *Id.* at 179 (citing *Matlock*, 415 U.S. at 171). "Common authority" derives from the "mutual use of the property by persons generally having joint access or control for most purposes." *Matlock*, 415 U.S. at 171 n. 7. Typically, all family members have common authority over all of the rooms in the family residence. *See United States v. Clutter*, 914 F.2d 775, 777 (6th Cir. 1990). However, family members may be deprived of common authority access to an enclosed space over which one family member has "clearly manifested an expectation of exclusivity." *Id.* at 778.

Here, the undersigned finds that Naomi had actual authority to consent to a search of the room. As stated above, she lived in the house, helped pay the bills, and generally had authority over the premises. There is no indication that DeWayne Major or anyone else "clearly manifested an expectation of exclusivity" as to the northwest bedroom. Thus, Naomi had the actual authority to consent to Officer Passman's search of the bedroom.

Furthermore, the evidence shows that even if Naomi lacked actual authority, she had the apparent authority to consent to a search of the northwest bedroom. Officer Passman testified that he believed the house was Naomi's, and that it had been as long as he could remember. He received no information or documentation that indicated otherwise. Passman also testified that the defendant had told the officers that he was sleeping on a couch in the living room. Passman further stated that there was nothing indicating the northwest bedroom was the defendant's room. Given this testimony, the undersigned finds that the circumstances created an objectively reasonable, good-faith belief that Naomi had the authority to consent to the search of the northwest bedroom.

     **5.**    **The Remaining Items Were Seized During the Execution of a Valid Search Warrant**

After the items in the northwest bedroom were discovered, Naomi Major withdrew her

consent and told Officer Passman to get a search warrant. Passman left the premises, prepared a search warrant application, and submitted it to a state district judge. The judge found probable cause and signed the search warrant. After a state search warrant was obtained, Passman returned to the house and executed the warrant, finding the remainder of the items the defendant seeks to exclude.

It should be noted that the defendant does not challenge the validity of the search warrant itself. Therefore, the items found pursuant to the warrant, including the firearms on which his federal charge is based, should be found admissible.

### 6. Any Statements Made By the Defendant Should Not Be Suppressed

The defendant also seeks the suppression of "any statements, admissions, or confessions purportedly made." He fails to specify which statements he is seeking to suppress, and he fails to mention any grounds on which to suppress them. Nevertheless, to the extent he argues that his *Miranda* rights were violated, the statements should be found admissible.

The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. AMEND. V. In *Miranda v. Arizona*, the Supreme Court held that statements obtained during a custodial interrogation without providing adequate warnings are inadmissible. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). However, a defendant who voluntarily gives a statement to law enforcement in a non-custodial situation need not be advised of his *Miranda* rights. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977).

Here, it appears that the defendant was arrested and read his *Miranda* rights just after Officer Passman discovered the plastic bag containing crack cocaine on the entertainment center. Officers Passman and Jones both testified that the defendant received all the required *Miranda* warnings. The only statement the defendant made before this point was to deny ownership of the

contents of the bag. Officer Passman testified, and the undersigned finds, that once Passman observed the bag, the defendant immediately said that it did not belong to him. Thus, the defendant volunteered this statement to Passman; it was not in response to any questioning by the officer.

The defendant also was not in custody at the time of this statement. "A suspect is 'in custody' for *Miranda* purposes when placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Cavazos*, No. 11-50094, 2012 WL 149331, at *2 (5th Cir. Jan. 19, 2012). Here, the defendant had not yet been placed under arrest. He had not been handcuffed or restrained in any way. There is no credible evidence that he was told he was not free to leave, or that his movement had been restricted in any way.[7] Thus, the statement was made voluntarily and in a non-custodial situation, and the admissibility of the statement is not barred by the Fifth Amendment. Any statements made after this point are also admissible, as the defendant had been properly Mirandized, and there is no evidence he invoked his right to silence or his right to counsel.

### B. Motion for Disclosure of the Government's Confidential Informant

The defendant also filed a motion to compel the government to disclose the identity of its confidential informant. He claims that the police approached the defendant solely based on the informant's tip, and he is thus entitled to know if sufficient reliability existed to justify said approach.

The Supreme Court has stated that whether a confidential informant's identity should be disclosed requires a balancing of the needs of the defendant in preparing his defense against the

---

[7] Although Major testified that he attempted to exit the house but was pushed back, the undersigned finds the testimony of the two officers more credible on this issue.

public interest in a free flow of information to the police. *Roviaro v. United States*, 353 U.S. 53, 62 (1957); *see also United States v. El-Mezain*, 664 F.3d 467, 491 (5th Cir. 2011). The Fifth Circuit employs this balancing by weighing three factors to determine if a confidential informant's identity must be disclosed: "1) the informant's degree of involvement in the crime, 2) the helpfulness of the disclosure to the defense, and 3) the Government's interest in nondisclosure."

Here, the first factor, the confidential informant's involvement in the crime, weighs in favor of nondisclosure. "The more active the participation, the greater the need for identification." *United States v. Ayala*, 643 F.2d 244, 246 (5th Cir. 1981). If the informant is a mere tipster, or if his "level of involvement in the criminal activity is that of minimal participation," the balancing favors nondisclosure. *United States v. Diaz*, 655 F.2d 580, 588 (5th Cir. 1981). The confidential informant in this case merely gave a tip that officers used to begin their investigation. There is no allegation that the informant took part in the commission of any crime, was a witness to the actions of the defendant, or played even a minor role in the criminal activity. The information provided by the informant only provided information sufficient for the police to make an initial approach of the house. Thus, this factor weighs in the government's favor.

The second factor, the helpfulness of disclosure to any asserted defense, also weighs in favor of nondisclosure. Mere speculation of helpfulness will not compel disclosure. *United States v. Trejo-Zambrano*, 582 F.2d 460 (9th Cir. 1978), *cert. denied*, 439 U.S. 1005 (1978). The mere possibility of obtaining relevant testimony is also not enough to compel disclosure. *United States v. Moreno*, 588 F.2d 490 (5th Cir. 1979), *cert. denied*, 441 U.S. 936, 99 (1979). The defendant must show a relationship between the asserted defense and the probable testimony of the informant. *United States v. Gonzales*, 606 F.2d 70 (5th Cir. 1979).

Here, however, the defendant has not asserted a defense that might justify the disclosure of the informant's identity. He has simply claimed that it would be in his interest to test the reliability of the informant, since the "knock and talk" was based on the informant's tip. Because he has not asserted a defense, he cannot show a relationship between such a defense and the probable testimony of the informant. Therefore, this factor weighs in the government's favor as well.

Finally, under the third factor of the balancing test, the government has asserted an interest in encouraging citizens, both this informant and others, to report suspicious acts or crimes. Indeed, the rationale behind the so-called "informer's privilege" is the government's interest in the safety of the informant and the informant's future usefulness to the authorities as a continuing confidential source. *See Roviaro*, 353 U.S. at 59; *United States v. Orozco*, 982 F.2d 152 (5th Cir. 1993). Although the government has not alleged the future usefulness of this specific informant, the undersigned recognizes the importance of protecting the confidentiality of all persons who participate in the Crime Stoppers program. The program relies on the idea that a person with knowledge of a felony crime may provide that information in complete anonymity. If the identity of these informants were regularly disclosed, the effectiveness of the program would be destroyed. The defendant has made no effort to show special circumstances which might justify the disclosure in this case. Thus, the final factor of the test also weighs in favor of nondisclosure.

## III. CONCLUSION

For the above-stated reasons,

**IT IS RECOMMENDED** that the motion to suppress [doc. # 32] and motion for disclosure of the government's confidential informant [doc. # 33] filed by defendant DeWayne A. Major be **DENIED.**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and FRCP Rule 72(b), the parties have **fourteen (14) days** from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

THUS DONE AND SIGNED at Monroe, Louisiana, this 16th day of February 2012.

KAREN L. HAYES
U. S. MAGISTRATE JUDGE